O. EDWIN OWEN, appellant, v. WILDEN HOSPITAL, INC., et al., appellees.

No. 48409.

(Reported in 62 N.W.2d 186)

JANUARY 12, 1954.

John Paul Jones and William H. Fulton, both of Des Moines, for appellant.

Hansen & Wheatcraft, of Des Moines, for appellees.

LARSON, J.—The plaintiff and the defendants Verne J. Wilson, A. W. Dennis, P. L. Park, T. Bruce Farmer, and Karl B. Greenlee were associated together as partners in a professional partnership known as "The Wilden Clinic." On or about the second day of March, 1949, plaintiff was disabled as a result of a congenital aneurism, took a leave of absence, and did not return to assume any of his duties until December 15, 1949. Although he tried hard, he had difficulty even with curtailed duties, his partners became apprehensive, and a staff meeting was held in July 1950, with the plaintiff and his wife present, to discuss the problem "of the amount of work that Dr. Owen was able to do." Most of the controversy arose from statements and circumstances surrounding these discussions and negotiations. On September 1, 1950, plaintiff left his work at the clinic and did not return.

After reviewing the pleadings and the evidence of the circumstances surrounding plaintiff's departure, the trial court found that plaintiff had failed to prove that he had been wrongfully expelled from the partnership, and that other issues raised by his petition, which were held in abeyance by stipulation of the parties pending a court decision on this issue, need not now be decided. We agree.

I. This case is triable de novo, and so it now becomes our duty also to find the facts. Plaintiff's testimony was aided by the testimony of his wife, his doctor, and a lawyer. Defendant doctors and a hospital employee, the former secretary to the plaintiff, testified for the defendants. From a careful study of the record and with due regard for the inferences urged by

plaintiff's counsel, we too are not convinced that the plaintiff has produced relevant and material facts of sufficient weight and certainty to establish the allegation of his petition.

Plaintiff's allegation of wrongful expulsion in his petition is his burden to prove. His own evidence in support of that claim is neither definite nor convincing. This his counsel admits, but argues that from all the evidence of both plaintiff and defendants, the implication is clear that plaintiff was forced out and had no choice but to withdraw. He draws this inference from what he calls a difference in the testimony of the defendant doctors. We fail to detect such a marked variation. Each partner had his assigned task to perform and each worked long hours under more or less pressure, and their tasks were interrelated, strenuous and demanding. When one partner was absent for a period, the burden increased upon the others. It then became necessary to send some work out, hire extra help, or become delinquent in some hospital activity. Upon his return plaintiff was to limit his activities at first to pathology, due to his physical condition and the fact that several hundred pathological records were not up to date. As plaintiff's condition improved he was expected gradually to assume more of his former duties, and in the spring of 1950 a renewal of the partnership agreement was executed by the partners. We find no waiver in this action. It was premised upon hope and expectation, not an assent to status quo. However, the courageous efforts of plaintiff to assume his portion of the tasks apparently were too much for his weakened physical condition. Thereafter he contracted another minor illness in June, was absent from his work about thirty days, and his physical condition seemed to be deteriorating. There is some evidence that some partners, as early as March or April, complained that plaintiff was not keeping up with his reduced assignments and wanted to help him get caught up, for it was not helpful to them or the clinic that the reports in the pathology department were behind. It appears that at no time were both past and current reports caught up. It was during this period that the evidence is somewhat conflicting as to whether plaintiff was spending more or less time at his work. It is undisputed that most of the partners spent ten or twelve hours a day at the clinic. Most of the testimony was to the effect that plaintiff spent

from 10 or 10:30 a.m. until 2:30 or 3:30 p.m. at his work, but even that seemed to tire him a great deal. Plaintiff's ailment was of such a nature that there was a very good chance of recovery, although his doctor, Dr. Walter D. Abbott, neurosurgeon, stated that the average period for full recovery was five years.

There was evidence that at the July meeting two matters of concern were presented—concern over plaintiff's health should he continue to try to perform the duties assigned to him, as well as to assume his other former duties which seemed necessary to continue the successful operation of the clinic, and concern over the results of his failure to perform even those tasks assigned to him and which were so vital to the successful and proper operation of the clinic.

It is true there was evidence that it was suggested at that meeting that, for his best interest and that of the partnership, he withdraw from the partnership and take up less arduous work. It is never pleasant for anyone to be confronted with the realization that he is not able to carry on his work. Plaintiff and his wife claimed that this suggestion came as a great shock to them. It was not a pleasant situation for plaintiff to face, but the fact that it was unpleasant did not prevent his resultant decision from being voluntary. All defendants testified that the decision was that of the plaintiff; that he asked for and took time to think it over. At least one witness stated that an alternative was discussed, i.e., that he hire a helper. Plaintiff, it seems, had promised in April to catch up on his work and said at that time that he believed he could do so by spending more time at it. His partners were solicitous and hopeful that he could do so, and even the plaintiff testified that "to the best of my knowledge my partners had been quite considerate of my misfortune prior to the meeting." There was corroborated evidence that in his attempt to keep his promise he tired easily, that his speech was affected, that his walk became unsteady in the afternoons, and that his physical condition was not improving. It is not seriously disputed that at no time since March 1949 had plaintiff performed more than a small part of the duties he had performed prior to that date. He continued as the head of the pathology department, but gave less anesthetics since his return than he had given in one day before his illness. A Doctor Barnett had

been hired by the partnership to do that work after the plaintiff was disabled. Plaintiff did no more manipulation, made no house calls, and left his coroner duties to his deputies, from which the partnership received no income.

There was absolutely no evidence of ill will. Plaintiff himself stated "personally, I have never experienced any animosity toward those partners * * *. I would say the break in relations with the other partners was not the result of any personal differences between me and them." There was not even a suggestion of any consideration other than plaintiff's condition and his ability, or lack thereof, to perform his duties, as entering into the alleged. agreement to settle and terminate the relationship.

We are impressed with the high standard of integrity and honesty displayed by the parties to this action. It is quite apparent from the record that there was great reluctance on the part of any of the witnesses to color their testimony unfairly. Certainly the remaining partners understood that plaintiff's withdrawal was his own decision and believed that a fair settlement had been reached under the agreed formula.

It was proposed at either the July meeting or the one a few days later, that they agree to the February 1st termination date, that he would cease his actual work on September 1, 1950, and the amounts paid him while on this leave of absence would be credited on the final settlement of his interest in the partnership under the dissolution provision of the partnership agreement or formula previously used when another doctor withdrew from the partnership.

At the time of the second meeting plaintiff was asked if he had arrived at any conclusion. Thereupon he stated, in effect, that if the partners were dissatisfied with his work he had best submit his resignation from the partnership. This is the point where plaintiff's and defendants' testimony differs materially. Plaintiff contends he said if the group did feel that he should leave that that is what he would *have* to do. Defendants testified he said, if the group thought it best for him to withdraw, that is what he *would* do. The parties differ as to the. verbiage used, though defendants seem more positive than the plaintiff. Both appear to place their own construction on the substance of the

discussion, and of course this is the nub of the controversy. None of the parties recall with convincing certainty the exact language used, but it is clear to us that it was honestly assumed from the expressions used that plaintiff had reached a decision to retire. The discussion then turned to when plaintiff would leave, and there was testimony that an agreement was reached by which the partnership would terminate February 1, 1951, that plaintiff would take a leave of absence from September 1, 1950, and would credit his share of earnings from September until February 1, 1951, on the share due him under the dissolution provisions of the partnership agreement. Owen expressed no objection to the settlement formula at that time. Mr. Greenlee, the office manager, testified that he asked the plaintiff "if those arrangements were satisfactory and he said yes." Greenlee further testified that after the meeting he and the plaintiff went to his office and that Owen expressed a desire to take his equipment in part payment of his interest and instructed Greenlee how to make payments due plaintiff under the arrangement. Doctor Park and Mr. Greenlee both testified that later the plaintiff said he was "glad to get out from under the load", and that he was "greatly relieved that the thing is settled now and it is off my mind."

Plaintiff himself testified that when the proposition was brought up and discussed in the August meeting and he was asked if it were agreeable, presumably by Mr. Greenlee, he inquired as to what else he could do, and claimed someone said if he refused he would be kicked out. When further interrogated about that statement plaintiff replied: "Perhaps there was a statement in jest to the effect that if I didn't agree to it I would be kicked out, or something like that. Whatever statement was made was more or less in jest, I am sure—at least I felt it was." Every defendant present at the meeting denied making or hearing such a statement made, even in jest, and claimed the decision at all times was entirely left to the plaintiff. If the statement were made in jest, we find it far from convincing evidence of compulsion or threat. By his own testimony it did not alarm plaintiff, cause him fear, distress or apprehension, or produce in him undue pressure or concern for his rights. It seems more likely that he accepted the frank and kindly discussion as

friendly, and as an expression of genuine concern over plaintiff's welfare and, understandably, the efficient conduct of the clinic business. He must have known that delinquency in charting the pathological reports was causing embarrassment to the other partners, as well as endangering the approval of the hospital by the American Board examiners. It appears that the Board did make a critical finding of the records in connection with the department of pathology.

■ II. While our review is de novo, we must give considerable weight to the findings and decree of the trial court, especially on conflicting testimony. We have always recognized that the trial court in such matters has a better opportunity, from seeing and hearing the witnesses, to pass more accurately upon the credibility of their testimony. The veracity of the witnesses here appears not to be questioned seriously. Thompson v. Thompson, 240 Iowa 1162, 39 N.W.2d 132, and citations; Hilliard v. Hilliard, 240 Iowa 1394, 39 N.W.2d 624; Modern Heat & Power Co. v. Bishop Steamotor Corp., 239 Iowa 1267, 34 N.W.2d 581; Reusch v. Shafer, 241 Iowa 536, 41 N.W.2d 651.

■ III. The partners had long before agreed and spelled out the method of evaluating the interest of a partner who voluntarily withdrew from the partnership. It was thought fair when executed under unemotional circumstances. It was used when Doctor Iosbaker withdrew, and at that time Doctor Owen was a remaining partner himself. The formula contemplated no wrecking of the business, no complete liquidation, but took into consideration the welfare of the existing business as well as that of the departing partner. Plaintiff's demand of the actual value of his share at the time of departure would seem to amount to a penalty on the other partners. Plaintiff justifies his claim on the ground that he was wrongfully expelled and therefore need not be bound by the withdrawal provisions of the partnership agreement. His demands are severe, his accusations serious, and his burden therefore justly heavy.

It is apparent that plaintiff's health did return after this load was lifted and that his partners were right in suggesting that the change was best for him as well as the partnership. We fail to find any substantial evidence of bad motive. Anyway

we cannot find in the record evidence, the weight of which is sufficient, or the quality of which is persuasive enough, to find as a fact that plaintiff was forced to retire from the partnership and was not merely persuaded that it was best for all concerned for him to withdraw voluntarily.

■■ IV. It is elementary that partners may by mutual assent dissolve their relations, and no added consideration is necessary. Voluntary withdrawal of one partner itself dissolves the relationship, and this may be accomplished either by an express agreement or by words and acts implying an intention to dissolve the partnership. 40 Am. Jur. 292, Partnership, section 235; 69 Am. St. Rep. 410. The agreement of settlement is another matter. Here it was defendants' contention that in addition to the alleged mutual agreement of dissolution, plaintiff by his actions confirmed the agreement, that he took his equipment valued at about $800 when he departed September 1, 1950, and that he did nothing from September 1, 1950 to February 1, 1951, to earn any share from the business. He did accept some $8000 in that period, which under the alleged agreement was to be credited on the final settlement of his partnership interest. It appears that the partners had been financially generous with him during his disability, for he was paid his full share all of the time except for about four months in 1949 when he was on leave without pay. It therefore seems reasonable that it was the plaintiff's intention to credit the $8000 upon his share under the dissolution provision of the partnership agreement. Due to the stipulation of the parties, these of course are questions we need not now decide for it was not defendants' burden to prove the withdrawal agreement, but it was plaintiff's burden under the issue tried to prove his wrongful expulsion from the partnership. Having reached the same conclusion as was determined in the trial below, the decision of the trial court must be affirmed.—Affirmed.

All JUSTICES concur.